## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 02 2019, 10:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of:<br><br>J.B. and E. B. (Minor Children)<br><br>and<br><br>P.B. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services and Child Advocates, Inc.,<br><br>*Appellees-Petitioners* | April 2, 2019<br><br>Court of Appeals Case No. 18A-JT-2431<br><br>Appeal from the Marion Superior Court Juvenile Division<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Scott Stowers, Magistrate<br><br>Trial Court Cause Nos. 49D09-1710-JT-889, 49D09-1710-JT-929 |

**Altice, Judge.**

## Case Summary

P.B. (Mother) appeals the termination of her parental rights to two of her minor children. She contends that the trial court's termination order is not supported by sufficient evidence.

We affirm.

## Facts & Procedural History

Mother has four minor children. R.C. is the father (Father) of E.B. and J.B., born in May 2016 and January 2008, respectively. Mother and Father's relationship was plagued by domestic violence, which J.B. often witnessed, causing her significant anxiety and trauma. Mother's other children – C.H. (born in March 2010) and J.H.[1] (born in July 2005) – are not subjects of the termination order, as they are in the care of their respective fathers.

During her pregnancy with E.B., Mother used PCP and marijuana, testing positive in February and April 2016. She gave birth to E.B. on May 12, 2016, again testing positive for PCP just prior to the birth. The hospital contacted the Indiana Department of Child Services (DCS) that same day, and DCS began its investigation the following day. Upon her release from the hospital, E.B. was

---

[1] Mother has a prior case of substantiated neglect (educational neglect) in 2012 involving J.H.

placed in the care of Mother's cousin (Cousin). J.B. remained in the care of Mother's aunt (Aunt), where she had been placed by Mother.

[5] On May 16, 2016, DCS filed petitions alleging that Mother's four children were children in need of services (CHINS). DCS alleged that Mother had "failed to provide the children with a safe, stable, and appropriate living environment free from substance abuse." *Exhibits* at 17. The CHINS proceedings were eventually dismissed with respect to J.H., who was in the care and custody of his father.

[6] J.B., C.H., and E.B. were adjudicated CHINS on September 8, 2016, following mediation at which Mother entered into an admission and agreement on services. Mother admitted J.B., C.H., and E.B. were CHINS because she "would benefit from services provided by DCS to maintain her sobriety." *Id.* at 31. C.H.'s father appeared at the CHINS hearing and waived his right to fact finding. Father (J.B. and E.B.'s father) did not appear. The court adjudicated all three children CHINS and, with respect to J.B. and E.B., continued their placement with Aunt and Cousin, respectively. Mother was granted supervised parenting time. The parental participation order, entered the same day, required Mother to engage in home-based therapy and follow all recommendations, submit to random drug/alcohol screens, complete a domestic violence intake or assessment and complete all resulting services and recommendations, and engage in family therapy with the children when appropriate. Additionally, the order provided that should Mother test positive

for illicit substances or alcohol, she would be required to engage in a substance abuse evaluation and follow all recommendations.

[7] As of the first review hearing in December 2016, Mother was doing well in services and making improvements. She had completed five clean drug screens but had also missed some. The court denied Mother's request for unsupervised parenting time and admonished Mother for having continued contact with Father, who had not yet appeared in the case. The court ordered DCS to make a referral for a substance abuse evaluation for Mother.

[8] At the permanency hearing in March 2017, the plan remained reunification. Mother was actively engaging in services and providing negative drug screens. She had begun intensive outpatient (IOP) substance abuse treatment the prior month. By the next hearing in June 2017, Mother had relapsed (though she denied it) and, as a result, DCS requested that she provide five consecutive clean drug screens. Mother was otherwise compliant with services, visiting with the children, and participating in her IOP treatment. Mother expressed eagerness to begin unsupervised parenting time, which the court granted and DCS authorized by August 2017.

[9] Shortly thereafter, Mother tested positive for cocaine and was unsuccessfully discharged from her IOP treatment. Additionally, on or about her first unsupervised visit with J.B. and E.B., Mother drove with the children despite her license being suspended and not having a car seat for E.B. Mother drove with E.B. on her lap. J.B. reported this incident to her therapist, and Mother

later indicated that J.B. was just trying to "create trouble in the case." *Transcript* at 20. Mother's parenting time returned to being supervised. Thereafter, visits were entirely suspended in the fall after Mother hit J.B. with a belt to punish her for inattention.

[10] At the permanency hearing on September 21, 2017, DCS recommended that the plan change from reunification to adoption for E.B. and J.B.[2] given the general lack of progress in the case, including Mother's "several relapses". *Id.* at 43. The court found that it was in E.B. and J.B.'s best interests to change the plan to adoption. Specifically, the court found that Mother had used illicit substances during the CHINS proceedings and that although she had engaged in therapeutic services to address her addiction, she had not progressed to the point where the children could be returned to her care. The court authorized Mother to resume supervised parenting time but strictly at an agency.

[11] On October 10, 2017, DCS filed the instant petitions for the involuntary termination of the parent-child relationship between Mother and E.B. and Mother and J.B.[3] Thereafter, Mother was evicted from her home around November 2017 and was unemployed. Mother facilitated unauthorized contact

---

[2] The plan remained reunification for C.H., with legal and physical custody eventually being changed to C.H.'s father.

[3] Termination of Father's parental rights was also sought and then granted on March 1, 2018. He does not participate in this appeal nor did he participate below.

between Father and J.B. and lied to service providers about it. She also used PCP and cocaine in December 2017.

[12] By the next CHINS review hearing in January 2018, Mother was still homeless and living in a shelter. Mother reported recently obtaining employment. She was participating in supervised parenting time, as well as home-based therapy, parenting education, and random drug screens. DCS agreed to re-refer Mother to IOP treatment.

[13] Mother completed a substance abuse assessment on February 19, 2018, but then used PCP again less than ten days later. During February, she failed to appear for several random drug screens and was late to a few parenting-time sessions. Mother was struggling with transportation issues and still trying to find housing. At the conclusion of a CHINS review hearing in February, the court decreased Mother's parenting time with E.B. and J.B.

[14] On March 6, 2018, Mother was charged with operating a vehicle while intoxicated endangering a person (OWI), resisting law enforcement, and driving while suspended, all Class A misdemeanors. The charges were for an incident that occurred after midnight two days earlier when Mother was driving and struck a vehicle parked on the side of the road with its flashers on. Mother

subsequently pled guilty to the OWI count, and the State dismissed the remaining counts.[4]

[15] Mother began a new IOP treatment program in March 2018. Thereafter, at a case management team meeting, Mother reported that she now had an apartment. She never provided DCS service providers, however, with a copy of the lease. During a supervised visit around May or June 2018, the visitation facilitator suspected Mother was under the influence and sought to have Mother take a drug screen. Mother refused. At a CHINS hearing on May 31, 2018, the DCS family case manager (FCM) noted that Mother had missed many random drug screens.

[16] The termination fact-finding hearing was held on July 10, August 8, and August 15, 2018. The guardian ad litem (GAL) testified that she still had major concerns regarding Mother's substance abuse, as well as domestic violence issues between Mother and Father. The GAL also noted "smaller concerns" regarding Mother's financial stability, housing situation, and "her ability to provide a nurturing, emotionally stable environment." *Id.* at 17. The GAL indicated that she would not recommend unsupervised parenting time and that she did not feel that the children would be safe if returned to Mother's care. In this regard, she noted Mother's frequent relapses, Mother's association with other substance abusers, and the possibility that Mother was living with Father.

---

[4] On August 13, 2018, Mother was sentenced to one year in jail with all but time served suspended to probation.

In the GAL's opinion, termination would be in the best interests of E.B. and J.B. because after two years Mother was still struggling with the same issues and only exercising supervised parenting time.

[17] FCM Ashley Hempel, who had been working with the family since April 2017, testified that although Mother was still participating in home-based therapy, supervised parenting, random drug screens, and IOP treatment, there had been minimal progress. As of the hearing date, FCM Hempel expressed her current concerns to include Mother's failure to provide a lease to establish she has stable housing, her "continuous relapse[s]", and the continued need for supervised parenting time. *Id*. at 45. FCM Hempel opined that giving Mother more time to complete services would not be beneficial to E.B. and J.B. because Mother "has not shown … any progress towards the children coming home". *Id*. at 48. FCM Hempel testified that she believed termination was in E.B. and J.B.'s best interests "so that they can have a stable home, um, that's free from domestic violence and substance abuse and they can go to school and succeed and excel" with a "sense of permanency in their life." *Id*. at 49.

[18] At the hearing in July, Mother testified that she had been working full-time as a certified nurse assistant (CNA) since January and had previously worked part-time at the same location. She acknowledged her history of evictions but claimed that she now had an apartment, though she did not present a lease into evidence. Mother denied responsibility with respect to her pending criminal case, claiming someone else was driving. She testified that she last used PCP and cocaine in December 2017.

[19] DCS impeached Mother's testimony in several regards. Evidence was presented, and Mother later admitted, that she used PCP on February 28, 2018. Further, Mother missed several subsequent random drug screens and refused one when she was suspected of being under the influence during a supervised visit around May 2018. DCS also presented Mother's guilty plea to the OWI offense. Further, for impeachment purposes, DCS presented interrogatories by Mother's employer, a garnishee defendant in civil debt proceedings against Mother, which indicated that Mother had been terminated by her employer in July 2018. On cross-examination, Mother denied that she had been fired but testified that the facility where she was working as a CNA would be closing in about six weeks.

[20] DCS presented evidence that Mother had been inconsistent with supervised visits in recent months. She visited with the children only one time in July 2018 and cancelled the visit on August 14, 2018, the day before the last day of the termination hearing. Mother had a habit of cancelling visits with E.B. if J.B. was not available for the visits also. Mother has a clear bond with J.B., but J.B.'s therapist noted "[a] lot of regression" related to visits with Mother. *Id.* at 90. J.B.'s therapist testified that J.B. and Mother have a co-dependent relationship and that J.B. would often lie to protect Mother. Additionally, when Mother hit J.B. with a belt, J.B. blamed herself.

[21] Finally, DCS presented evidence that J.B. and E.B. were thriving in their respective placements. E.B. had been in Cousin's care since her birth, and J.B.

had been in Aunt's care for well over two years. Both J.B. and E.B. were in pre-adoptive homes, and DCS's plan for the children was adoption.

[22] On September 21, 2018, the trial court issued its order terminating Mother's parental rights with respect to J.B. and E.B. Mother now appeals. Additional facts will be provided below as needed.

## Discussion & Decision

[23] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[24] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet

their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[25] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[26]     On appeal, Mother asserts that there is insufficient clear and convincing evidence that the conditions resulting in J.B. and E.B.'s removal would not be remedied, that the continuation of the parent-child relationship poses a threat to their well-being, that termination is in the best interests of the children, and that there is a satisfactory plan for their care and treatment following termination. We will address each of these in turn, as needed.

[27]     Mother first contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the children's removal or continued placement outside the home will not be remedied. In so arguing, Mother does not challenge any of the trial court's specific findings as not supported by the evidence. She simply directs us to other evidence, including her own testimony that she had full-time employment as a CNA and had acquired an apartment. Mother also notes that at the time of the hearing she was actively participating in substance abuse services and random drug screens. While she acknowledges a "back-and-forth battle with substance abuse," Mother asserts that the testimony of her home-based therapist, Joy Boyd, "showed that Mother had made substantial progress in addressing the underlying reasons for her substance abuse." *Appellant's Brief* at 22. In sum, Mother claims that "the evidence of changed conditions as of the date of the termination hearing was overwhelming." *Appellant's Reply Brief* at 6. We cannot agree, and we reject Mother's invitation to reweigh the evidence.

[28]     In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at

the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id*. The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Further, it is within the trial court's discretion to disregard efforts made only shortly before termination and to weigh more heavily a parent's history of conduct prior to those efforts. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[29]     Here, the trial court concluded with respect to I.C. § 31-35-2-4(b)(2)(B)(i):

> There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by [M]other. [Mother] has had over two years to put forth an effort and has not done so. Stable housing and substance abuse remain major concerns. Despite multiple referrals, [Mother] has made minimal progress. Despite several months of Substance Abuse Treatment, [Mother] continues to use drugs, including recent use of Hydrocodine [sic] and PCP. She has also missed several screens.

*Appendix* at 98.

[30]     The record establishes that the primary reason for the children's placement outside Mother's care was her substance abuse issues. Part and parcel of this

was Mother's resulting instability in housing and employment. There is no doubt that Mother participated in services in an attempt to address her ongoing battle with substance abuse. But after two years, she had made no sustained progress. She had a number of relapses and used PCP – her drug of choice – only months before the termination hearing. On a subsequent occasion, she came to a supervised visit, appearing to be under the influence, and refused a drug screen both before and after the visit. Mother never successfully completed IOP treatment, being discharged from the first program for cocaine use nearly a year after beginning treatment. She began a new IOP program several months later in March 2018 but continued to struggle.

[31] Mother claimed at the hearing to now have full-time employment (since January 2018) and housing (since March 2018). However, despite demands to see a copy of the lease, Mother refused to provide it to her FCM, and she did not present it at the termination hearing. Although Boyd visited the apartment shortly before the last day of the hearing and found it to be clean and appropriate with no safety concerns, there is no indication that Boyd verified that Mother's name was on the lease. Additionally, the GAL expressed concern that Mother might be living with Father. With regard to employment, DCS impeached Mother's testimony by providing a document indicating that she had been recently terminated. Boyd, who was clearly on Mother's side at the hearing, acknowledged that Mother had a history of lying to providers. Mother was also dishonest at the termination hearing with respect to her criminal case and the date of her last drug use. In sum, the trial court could

reasonably disregard Mother's claims of recent housing and employment stability.

[32] Contrary to her assertions on appeal, the record establishes that Mother was not fit to care for J.B. and E.B. at the time of the termination hearing. She had a lengthy history of drug abuse, including many relapses and missed drug screens during the CHINS and termination proceedings, and she had yet to successfully complete an IOP treatment program. FCM Hempel opined that even with more time, she did not believe Mother would be able to remedy the reasons for DCS involvement.

[33] The trial court's determination that there is a reasonable probability that the conditions that resulted in the removal of J.B. and E.B. will not be remedied is supported by clear and convincing evidence. Therefore, as I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to the children's well-being.

[34] Mother also asserts that the evidence was insufficient to support the trial court's finding that termination was in the children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v.*

*Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[35] Mother asserts that "there remain options short of termination, including continued wardship under the CHINS matter while Mother completes here [sic] work towards reunification." *Appellant's Brief* at 25. Mother, however, has had more than two years to move toward reunification. She has not made any significant progress. In fact, Mother still had only supervised parenting time, which she often missed in the months around the hearing. The GAL testified that she could not recommend unsupervised visits at the time of the hearing[5] and that she did not believe the children would be safe in Mother's care due to her continued involvement with Father, her substance abuse issues, and the people Mother surrounds herself with.

---

[5] Boyd was more positive in her assessment of Mother's progress and testified that she would recommend unsupervised parenting time. This differing opinion, however, amounts to conflicting evidence that was weighed by the trial court and cannot be reweighed on appeal. *See In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016) (in termination cases, we do not have license to reweigh the evidence).

[36] The GAL opined that termination was in the children's best interests, explaining:

> [T]he children have been removed from mother's care for [] two years, they [] are currently two years later, only on supervised time [] with [M]other, and even those supervised visits have issues[. E.B.] has never actually known [Mother] as her mother and [] the domestic violence and substance abuse issues, and financial and housing stability that I mentioned today, all of those cause me [] to believe that not only should the children not go home, but that they should stay in the safe, stable, [] loving environment with the caregivers that they've been with for two years, and that with [whom] they are very bonded.

*Transcript* at 29. Similarly, FCM Hempel testified that termination was in their bests interests so that they can have a stable home, free from domestic violence and substance abuse, where they can regularly attend school and succeed with a sense of permanency in their lives that Mother has not been able to provide. In this regard, FCM Hempel also noted Mother's continued struggle with sobriety and her failure to progress with parenting time.

[37] Mother's attempt to liken this case to *In re G.Y.*, 904 N.E.2d 1257, a case in which our Supreme Court reversed the termination of a mother's parental rights, is unavailing. In *G.Y.*, the mother was incarcerated for offenses she committed before her child's conception. The Court observed that for the first twenty months of the child's life, before Mother's incarceration, "the record gives no indication that Mother was anything but a fit parent." *Id.* at 1262. After her incarceration and the CHINS adjudication, the mother "took positive

steps and made a good-faith effort to better herself as a person and as a parent." *Id*. Despite her incarceration, she remained committed to maintaining a relationship with her child and reunifying with him upon her release. Further, her release from prison was imminent, and she had already secured suitable housing and employment. *Id*. at 1265.

[38] Mother is far from being on equal footing with the mother in *G.Y.* Further, she does not have a strong bond with E.B., who has been in Cousin's care since birth, and both E.B. and J.B. are in pre-adoptive homes where they are thriving. *Cf. H.G. v. Ind. Dep't of Child Servs.*, 959 N.E.2d 272, 293 (Ind. Ct. App. 2011) ("Because no adoptive family has been identified and the children were placed in a new foster home shortly after the termination hearing, there appears to be little harm in allowing the parents to continue working toward reunification."), *trans. denied*. As noted above, both the GAL and FCM recommend termination. Under the circumstances of this case, we conclude DCS presented sufficient evidence to show by clear and convincing evidence that termination was in the best interests of J.B. and E.B.

[39] Mother next challenges whether there is sufficient evidence that DCS has a satisfactory plan for the care and treatment of the children following termination. The children are in pre-adoptive homes where they have resided since the beginning of the CHINS proceedings and, in E.B.'s case, since she was born. They are doing well and have developed a strong bond with their respective care givers. The plan for the children is adoption. This is a satisfactory plan. *See In re D.D.*, 804 N.E.2d at 268 ("[the] plan need not be

detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated").

[40] Finally, Mother asserts that the termination order must be reversed because DCS "cannot establish that 'all reasonable efforts' at reunification have been exhausted." *Appellant's Brief* at 29. Her argument is misplaced, as DCS was not required to establish this in order to obtain termination of her parental rights. *See In re H.L.*, 915 N.E.2d 145, 148 (Ind. Ct. App. 2009) (although DCS is generally required to make reasonable efforts toward reunification during CHINS proceedings, "this is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order").

[41] Nevertheless, we observe that DCS provided Mother with numerous services for more than two years. She received multiple referrals for substance abuse treatment but continued to relapse and never successfully completed an IOP program. DCS granted Mother unsupervised parenting time but Mother endangered the children at her first opportunity by driving them unrestrained and without a driver's license. Then during supervised parenting time, Mother struck J.B. with a belt. Mother successfully completed a couple of services (domestic violence classes and parenting education) but the vast majority of services remained uncompleted. The reunification process was unsuccessful due to Mother's conduct and want of progress, not because of a lack of services.

[42] Judgment affirmed.

Najam, J. and Pyle, J., concur.